SEIKO SPORTING GOODS USA, INC., Plaintiff,

v.

KABUSHIKI KAISHA HATTORI TOKEITEN, also known as K. Hattori & Co., Ltd., and Seiko Corporation of America, Defendants.

No. 82 Civ. 3766 (RLC).

United States District Court,
S. D. New York.

July 26, 1982.

Taggart & Colucci, New York City, for plaintiff; Leslie D. Taggart, Jeanne T. Fennell, Susan Progoff, New York City, of counsel.

Blum, Kaplan, Friedman, Silberman & Beran, New York City, for defendants; Harold I. Kaplan, Michael I. Wolfson, New York City, of counsel.

Ronald J. Thomas, New York City, for Seiko Corp.

## OPINION

ROBERT L. CARTER, District Judge.

### FACTS

This is a trademark infringement action. Plaintiff, which is charged with infringing defendant's trademark, commenced this action on June 8, 1982, seeking a declaratory judgment entitling it to use the mark "Seiko" on its tennis racquets and other sporting goods and in its trade name. Plaintiff claims that it has been selling goods in the United States with the Seiko mark affixed thereon since 1978. Defendants moved for preliminary and permanent relief seeking to enjoin plaintiff from using the Seiko trademark or Seiko in its trade name. The hearing on the motion for preliminary and permanent relief was merged, and the matter came on for hearing on July 15 and 16.

At the close of the hearing the court announced that it was satisfied that defendants were entitled to preliminary relief and set forth its reasons on the record. The court stated, however, that it would file a written opinion with case citations which would set out its reasons in a more cogent fashion than was possible in the announcement from the bench. What follows is that opinion.

Defendant K. Hattori & Co., Ltd. is a Japanese company. Defendant Seiko Corporation of America is the wholly owned subsidiary of the Japanese defendant, and the American corporation markets and promotes all Seiko brand products in this country, which include clocks, watches and various other electronic products. Seiko Time Corporation ("Seiko Time") is a wholly owned subsidiary of Seiko Corporation of America. Its function is to import, distribute and market Seiko brand and Seiko LaSalle brand watches and clocks in the United States.

K. Hattori has used the trademark Seiko in this country in connection with the sale and distribution of watches and clocks since 1949, and owns a number of registrations for the mark Seiko. The first registration is # 686,264, issued on October 6, 1959, and renewed on October 6, 1979. It relates to watches and clocks. Registration # 910,-057, renewed on March 16, 1971, is on metronomes. Registration # 948,878, renewed on December 19, 1972, is on electric shavers. Registration # 953,110, renewed on February 13, 1973, is on camera shutters. Registration # 987,344, renewed on July 2, 1974, is on calculating machines, cash registers

and desk top computers. Registration # 1,168,362, issued on September 8, 1981, is on pens. Registration # 1,122,960, issued on July 24, 1979, covers cigarettes and pipe lighters. There are several additional registrations covering various classes of watches and clocks and cameras apparently not embraced in the above registrations.

The suggested retail price range of the Seiko watches goes from moderate to expensive. Some Seiko watches retail for $1,000. In 1978 and 1979, Seiko Time sold 2,000,000 watches and 100,000 clocks in this country for a gross of $154,000,000. In 1980 Seiko Time sold 2,000,000 watches and 150,000 clocks for a gross of $155,000,000, and in 1981 it sold 2,500,000 watches and 300,000 clocks for a gross of $210,000,000.

Its annual advertising budget is in excess of 20 million dollars, and the bulk of its promotion is via television (85 percent of the 20 million dollar budget is spent on television advertising). About 50 percent of its television advertising expenditures consists of time bought on televised sporting events, e.g., Baseball World Series, World Soccer Championship, Volvo Grand Prix (tennis), NFL Football, etc. Its commercials will usually display a Seiko clock or watch accompanied by some blurb about the precision of Seiko watches and clocks, or a Seiko Time piece will be featured as the official timer of the sports telecast. A Seiko clock is on permanent display at Madison Square Garden and Yankee Stadium, among other locales. Part of its television advertising is on news programs and on such other assorted T.V. programs as "60 Minutes", "Today Show," etc.

In addition to its 20 million dollar annual advertising budget, Seiko Time over the past four years has spent approximately 30 million dollars in what is called cooperative advertising. Under this program Seiko Time assumes 50 percent of the cost, and the distributor and retailer 25 percent each of such advertising. This advertises the Seiko mark in connection with the retailer and/or distributor.

Seiko Time distributes Seiko watches and clocks through some 16 distributors with approximately 18,000 retail outlets in the United States. Seiko products are sold in department stores such as Saks Fifth Avenue, Lord and Taylor, and Neiman Marcus, and such jewelry stores as Tourneau.

On May 16, 1982, Seiko Time became aware of an advertisement in a circular by Caldor, Inc. displaying tennis racquets bearing the mark Seiko. In response to communication by defendants' counsel, plaintiff was identified as the source of the goods. A conference with a Chicago attorney for plaintiff and Christopher Stoller, an officer of plaintiff, and Seiko's counsel followed. The matter was not resolved and this lawsuit was commenced.

Defendants bought a number of these tennis racquets, and supplied one to Tracy Leonard, who is equipment editor for Tennis Magazine, requesting that he test it. Leonard tests every tennis racquet introduced on the United States market and reviews its strengths and weaknesses in an issue of the magazine. His method of testing is to play with the racquet himself, and to have the person or persons he is playing with use the racquet. In this way, he measures his own reactions against others as to how the racquet feels under playing conditions. Then he tests various parts of the racquet in his laboratory. This procedure was followed in the testing of plaintiff's product. Leonard concluded that the racquet was of inferior quality. He testified that it is light and flexible, which are not necessarily bad features, but the racquet transmits a great deal of shock to the arm, which is very bad.

Defendant also secured the services of Michael Rappaport to do a hurried opinion survey for this case. Rappaport has been engaged in survey research since 1969 and market research since 1979. He was asked to determine whether the public was likely to be confused as to the source of plaintiff's goods.

He had only nine days to complete the assignment. He prepared a questionnaire consisting of eight questions, hired and trained three interviewers who, over a three day span, interviewed 149 tennis players. Seven sites were chosen in Mercer and Mid-

dlesex Counties, New Jersey. Apparently these sites are close to where Rappaport resides or works and were chosen as a convenience.

The interviewers were told to interview at random any tennis players 16 years old or older when they were going on the court to play or were leaving. They were to interview each person privately, and no interviews were to take place in the presence of another being questioned. They were instructed to read from the form and fill out the questionnaire based on what was said. After the first three general questions, the interviewers were to show the plaintiff's tennis racquet and ask questions 4, 5, 6, and 7, which relate to the interviewee's recognition and knowledge concerning plaintiff's product. The interviewers returned the forms to Rappaport and were debriefed.

**1.** The questions and responses are set out below:

QUESTION 1
HOW MANY TENNIS RACQUETS DO YOU OWN?

| | | Percent |
|---|---|---|
| 1 – | 48 | 32 |
| 2 – | 52 | 35 |
| 3 – | 21 | 14 |
| 4+ – | 27 | 18 |
| 0 – | 1 (borrowed racquet) | 1 |

QUESTION 2
BRAND NAME OF RACQUET?

| | | | Percent |
|---|---|---|---|
| Prince | 33 | | 22 |
| Head | 26 | | 17 |
| Wilson | 26 | | 17 |
| Dunlop | 14 | | 9 |
| All other | 50 | (includes multiple bought at one time) | 34 |

QUESTION 3
WHY DID YOU SELECT THAT BRAND?    Percent
CHARACTERISTICS INCLUDING
EXPERIENCE, LIKE WOOD ETC.    68    46
PRICF INCLUDING RECEIVED
AS GIFT    34    23
RECOMMENDATIONS OF VARIOUS
KINDS    20    13
ALL OTHER ANSWERS INCLUDING
DON'T KNOW    27    18

QUESTION 4
WHAT IF ANYTHING HAVE YOU HEARD
ABOUT THIS BRAND OF TENNIS RACQUET?

| | | | Percent |
|---|---|---|---|
| 1. | MENTION SEIKO WATCHES EXPLICITLY | 4 | 3 |
| 2. | ALL OTHER MENTIONS OF WATCHES | 4 | 3 |
| 3. | ANY OTHER ANSWER EXCEPT NOTHING | 5 | 3 |
| 4. | NOTHING, NEVER HEARD OF, DON'T KNOW | 136 | 91 |

Rappaport numbered the forms 1–149, made copies and then tabulated the answers. While Rappaport knew the reason for the survey, those doing the actual interviewing had no such knowledge.

The most likely confusion was found by him to be expressed when "watch" was answered to question 5 and "Japan" to question 7. There were 75 such responses or 50 percent of the total. Next in order he placed those who responded "watch" to question 5, but did not mention "Japan" in answer to question 7. There were 15 of these responses or 10 percent of the total. Third were listed those who failed to mention "watch" in answer to question 5, but mentioned "watch" in answer to question 6 and "Japan" in answer to question 7. There were 26 such responses or 17 percent of the total.[1]

QUESTION 5
WITH WHOM OR WHAT DO YOU ASSOCIATE
THIS TENNIS RACQUET?

| | | Percent |
|---|---|---|
| | | Percent |
| 1. WATCHES, CLOCKS | 90 | 60 |
| 2. ANY OTHER ANSWER | 59 | 40 |

QUESTION 6
WHAT OTHER PRODUCTS, IF ANY, DO YOU
THINK ARE MADE BY THE MANUFACTURER
OF THIS RACQUET?

| | | Percent |
|---|---|---|
| | | Percent |
| 1. ANSWERED WATCH IN QUESTION 5 | 90 | 60 |
| 2. NOT WATCH IN QUESTION 5 – WATCH IN QUESTION 6 | 34 | 23 |
| 3. NOT WATCH IN QUESTION 6 | 25 | 17 |

QUESTION 7
IN WHAT COUNTRY DO YOU THINK THIS
TENNIS RACQUET IS MADE?

| | | Percent |
|---|---|---|
| | | Percent |
| 1. JAPAN | 117 | 79 |
| 2. ALL OTHER ANSWERS | 32 | 21 |

Rappaport devised a combination of answers to questions 5, 6 and 7 in what he regarded as descending order of confusion as set out below:

QUESTION 8
HOW OLD ARE YOU?

| | | Percent |
|---|---|---|
| 16 – 29 | 68 | 46 |
| 30 – 48 | 48 | 32 |
| 40 – 49 | 23 | 15 |
| 50+ | 8 | 5 |
| Refused | 2 | 2 |

| | | Number | Percent |
|---|---|---|---|
| 1. | Watch in Q.5   Japan in Q.7 | 75 | 50 |
| 2. | Watch in Q.5   Not Japan in Q.7 | 15 | 10 |
| 3. | Not Watch in Q.5   Watch in Q.6 Japan in Q.7 | 26 | 17 |
| 4. | Not Watch in Q.5   Watch in Q.6 Not Japan in Q.7 | 8 | 5 |
| 5. | Not Watch in Q.5   Not Watch in Q.6   Japan in Q.7 | 16 | 11 |
| 6. | Not Watch in Q.5   Not Watch in Q.6   Not Japan in Q.7 | 9 | 6 |

Leonard Stoller testified as President of plaintiff organization. He stated that the company had been in the business of selling Seiko tennis racquets since 1978; that plaintiff had selected the name Seiko in 1977, and that the mark was first used in the summer of 1978. He testified that his gross dollar sales of Seiko tennis racquets in 1979 was $20,000. Two invoices purporting to show sales in 1978 were introduced, as were ledger cards separated from plaintiff's other ledger records purporting to show promotional sales. He testified that Seiko was first used as part of his company's name in 1981. Price lists purporting to represent 1979, 1980 and 1981 were offered. Photographs of tennis racquets which Stoller was alleged to have designed and marketed since 1978 were offered. Photographs purporting to show plaintiff displaying the Seiko mark over booths at sporting goods exhibition shows in 1979 and 1980 were introduced. Stoller testified that he had attended various sporting goods shows since 1979 at which the Seiko trade name was used and Seiko tennis racquets displayed.

## DISCUSSION

▆ Trademark rights come through use. *Time Mechanisms, Inc. v. Qonaar Corp.*, 422 F.Supp. 905 (D.N.J.1976). Ownership of a registered trademark creates a presumption of validity, *National Auto. Club v. National Auto Club, Inc.*, 365 F.Supp. 879, 882 (S.D.N.Y.1973) (Carter, J.), *aff'd without opinion*, 502 F.2d 1162 (2d Cir. 1974), and the owner's exclusive right to use the mark in commerce. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 11 (2d Cir. 1976). Whatever rights a trademark confers are those "appurtenant to an established business or trade in connection with which the mark is employed." *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S.Ct. 48, 50, 63 L.Ed. 141 (1918). Priority of use determines who has seniority in entitlement to use of a trademark. *WGBH Educational Foundation, Inc. v. Penthouse Int'l Ltd.*, 453 F.Supp. 1347, 1350 (S.D.N.Y.1978) (Carter, J.), *aff'd without opinion*, 598 F.2d 610 (2d Cir. 1979), and cases cited.

There can be no question on this issue. Defendant has used the mark in this country at least since 1949. Plaintiff asserts that it had begun to use the mark in connection with its tennis racquets in 1978 and as part of its trade name only since 1981.

However, Stoller's testimony can not be credited. There were no identifying dates on any of the documentation offered, which suggests recent preparation for this case. The programs of all the sporting goods exhibition shows introduced identify plaintiff as Wellington, not Seiko, and two such shows (Chicago in 1979 and Anaheim, Cal. in 1980) not only list Wellington and not Seiko, but list Wellington under roller skating and not under tennis racquets or any other designation associated with tennis. The only reliable exhibit introduced by plaintiff is # 47, and # 48 which are dated and show plaintiff had begun to utilize the name Seiko in 1982. Accordingly, I find that plaintiff first began the use of Seiko as a part of its trade name in 1982 and began to use the mark Seiko in connection with tennis racquets in 1982.

The considerations which are determinative in an issue of trademark infringement are:

"The strength of [the] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap and the reciprocal of defendant's good faith in adopting its own mark and the sophistication of the buyers." *Polaroid Corp. v. Polaroid Electronics Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). The above listing is only a partial one since other factors may have to be taken into account. *Id.*

▆ Defendant deals chiefly in watches, clocks and various other electronic devices, and plaintiff is marketing tennis racquets, but it has been the law in this circuit since *Yale Electric Corp. v. Robertson*, 26 F.2d 972 (2d Cir. 1928) (*flashlights v. locks*), that a trademark owner has the right to protection on related, non-competing goods. That

doctrine was most recently reaffirmed in *Scarves by Vera, Inc. v. Todo Imports, Ltd.*, 544 F.2d 1167 (2d Cir. 1976) (*scarves v. fragrances*). Where the claim of infringement because of the use of the mark on the related, non-competing products has not been sustained, the allowed use of the mark on non-competing goods has been precisely defined. *Scarves by Vera, Inc. v. Todo Imports, Ltd., supra*, 544 F.2d at 1172.

In this case while defendant is most closely identified with clocks and watches, it has expended huge sums sponsoring sporting events, including tennis championships, in advertising its mark. Moreover, plaintiff has not adopted the Seiko mark and trade name in good faith. Its purpose in doing so clearly is to capitalize on defendants' reputation and the widespread public recognition of the Seiko name. It cannot secure a competitive position, however, by confusing the public into mistakenly purchasing plaintiff's articles believing them to be defendants'. *Philip Morris Inc. v. R. J. Reynolds Tobacco Co.*, 188 U.S.P.Q. 289 (S.D.N.Y. 1975) (Stewart, J.).

▇ The mark Seiko is arbitrary, fanciful and non-descriptive as applied to any product and therefore is entitled to protection. *See Mushroom Makers, Inc. v. R. G. Barry Corp.*, 441 F.Supp. 1220, 1226 n.25 (S.D.N.Y.1977) (Weinfeld, J.), *aff'd*, 580 F.2d 44 (2d Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). While plaintiff has sought to show that Seiko is a generic term in Japanese, it is not so recognized in this country. Accordingly, the mark must still be regarded as arbitrary and fanciful in the United States. Defendants have so advertised their product on television and otherwise that the mark has acquired a secondary meaning so that its primary significance in the minds of consumers is identification of the source of the product. *See American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 663 (2d Cir. 1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980) and cases cited.

▇ Plaintiff's use of defendants' mark in its goods and as a trade name is likely to cause confusion. The findings of the survey undertaken by Michael Rappaport underscore this probability. The survey was organized hurriedly because there was a short span of time between defendants' filing the order to show cause seeking preliminary relief and the date set for the hearing.

The questions asked were fair, and the key questions were appropriate to indicate whether the interviewees might or might not be inclined to believe that defendant was the source of plaintiff's product. The results show overwhelmingly that such association was likely. True, the survey was limited. Only 149 people were canvassed, and all were from two counties in New Jersey. While a nationwide survey would have been more conclusive, there is nothing to show that the 149 interviewees were atypical tennis players—the universe involved. Moreover, there is the testimony of Richard Hatton who saw one of plaintiff's tennis racquets at a discount store in Fairfield, Ohio. On seeing the Seiko name on the racquet, Hatton testified that he assumed it was a quality item and a Seiko product.

▇ The defendants have clearly established their right to preliminary relief: possible irreparable injury and probable success on the merits. *Sonesta Int'l Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250 (2d Cir. 1973); *Triebwasser & Katz v. American Tel. & Tel. Co.*, 535 F.2d 1356, 1359 (2d Cir. 1976). Plaintiffs are seeking to make a profit by palming off an inferior tennis racquet as a Seiko product. While Seiko sells some watches at modest prices, their products are known for quality. Unless it is enjoined from using defendants' trademark and trade name in its business, defendants would be injured in name and reputation since there is the likelihood of confusion as to the source of plaintiff's inferior product. Accordingly, the motion for preliminary relief is granted.

SETTLE ORDER.