V & V FOOD PRODUCTS, INC., Plaintiff,

v.

CACIQUE CHEESE CO., INC., and V.F. Garza & Sons, Defendants.

No. 86 C 8695.

United States District Court, N.D. Illinois, E.D.

April 5, 1988.

Melvin M. Goldenberg, Margaret M. O'Brien, Sandra B. Weiss, Jones, Day, Reavis & Pogue, Chicago, Ill., for plaintiff.

Allen H. Gerstein, Terrence W. McMillin, Richard M. LaBarge, Marshall, O'Toole, Gerstein, Murray & Bicknell, Chicago, Ill., for defendants.

## MEMORANDUM ORDER

BUA, District Judge.

The parties to this action tried their case before a jury in October 1987. None of the parties is entirely satisfied with the jury's verdict. Defendants have filed a motion for judgment notwithstanding the verdict. They have also asked the court to make additional findings regarding the parties' respective trademark rights. Plaintiff has countered by filing its own motion for judgment NOV, or in the alternative, for a new trial. For the reasons stated herein, this court grants both plaintiff's and defendants' motions for judgment NOV. Furthermore, in order to clarify the scope of the parties' rights, the court makes the following additional findings: Defendants may not use the RANCHERO trademark in the states of Illinois, Indiana, Michigan, and Wisconsin; and plaintiff may not use the RANCHERITO trademark outside those states. Finally, this court grants plaintiff's motion for a new trial solely for the purpose of determining the damages caused by defendants' infringement of plaintiff's CHIHUAHUA trademark.

## FACTS

Plaintiff V & V Food Products, Inc., ("V & V") is in the business of manufacturing, distributing, and selling food products. In the mid–1960s, V & V first used RANCHERITO as a trademark for a type of Mexican cheese sold in the Chicago metropolitan area. On September 9, 1966, V & V obtained an Illinois trademark registration for its RANCHERITO trademark. It obtained another Illinois registration for the same trademark on August 9, 1976. V & V renewed this trademark on March 12, 1986.

In 1975, V & V first used the mark CHIHUAHUA for another Mexican-style

cheese distributed under its label. V & V obtained an Illinois registration for its CHIHUAHUA trademark in the early 1980s. In 1982, V & V filed two applications for federal registration of its CHIHUAHUA trademark, both of which were denied. In 1987, however, V & V successfully obtained federal registration of the CHIHUAHUA mark.

Defendant Cacique Cheese Co. ("Cacique") began its business in the mid–1970s in California. It adopted the trademark RANCHERO for its own Mexican-style cheese. Cacique obtained a federal registration for its RANCHERO trademark on April 28, 1981. Subsequently, Cacique obtained distributors and expanded its business into Hispanic markets in New York, Florida, and Texas. In 1985, Cacique learned that V & V's RANCHERITO product was being sold in the Texas market.

On January 31, 1986, V & V applied for federal registration of its RANCHERITO trademark. The trademark examiner refused registration of this trademark, however, because of Cacique's prior registration of its RANCHERO trademark.[1] V & V then filed a petition to cancel Cacique's federal registration of the RANCHERO trademark in the United States Patent and Trademark Office ("PTO") on March 28, 1986.

On November 7, 1986, V & V filed suit against Cacique and V.F. Garza & Sons (Cacique's Chicago-area distributor), alleging infringement of its rights to use the RANCHERITO trademark. V & V later amended its complaint to add a federal count for infringement of its CHIHUAHUA trademark. Cacique asserted counterclaims against V & V for infringement of its allegedly superior rights to the RANCHERO trademark based upon its federal registration of that mark. V & V's application to register its RANCHERITO trademark and its petition to cancel Cacique's RANCHERO trademark both have been stayed pending the outcome of this case.

The parties tried this case before a jury. The jury found that both Cacique's federal registration for RANCHERO and V & V's federal registration for CHIHUAHUA were invalid. Cacique moved for judgment notwithstanding the verdict pursuant to Fed.R.Civ.P. 50(b). Cacique also asked this court to make additional findings with respect to the parties' territorial rights to their trademarks pursuant to Fed.R.Civ.P. 49(a). In addition, Cacique moved to enjoin V & V from using its RANCHERITO trademark in the territories that this court awards to Cacique, pursuant to Fed.R. Civ.P. 59(e). V & V, on the other hand, filed a motion to amend the judgment based on Rule 59(e), alleging that Cacique infringed its trademark rights to RANCHERITO. V & V also moved for judgment notwithstanding the verdict, or in the alternative, for a new trial with respect to that portion of the verdict which invalidated the federal registration of its CHIHUAHUA trademark.

## DISCUSSION

I. *Cacique's Motions for JNOV and for the Court to Make Additional Findings*

A.  Motion for JNOV

A court should enter judgment notwithstanding the verdict only if "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Geldermann & Co. v. R.A. Hartley & Son, Inc.*, 543 F.Supp. 1062, 1063 (N.D.Ill.1982) (quoting *Pedrick v. Peoria and E.R.R.*, 37 Ill.2d 494, 510, 229 N.E.2d 504, 514 (1967)).

In the case at bar, the jury returned a verdict finding Cacique's federal registration for its RANCHERO trademark to be invalid. The jury's decision can only rest on one of two possible bases: Either Cacique procured the trademark through fraud, or V & V had superior rights to the trademarks.

1. The parties have stipulated that RANCHERO and RANCHERITO are confusingly similar

mark based on prior use. Because the allegation of fraud finds no support in the evidence, and because the assertion of prior use does not justify the complete invalidation of the RANCHERO mark, the jury's verdict cannot stand.

### 1. *Fraud*

■ The Lanham Trade-Mark Act, which governs federally registered trademarks, provides that a registration may be canceled if it was obtained by fraud. 15 U.S.C. § 1064(c) (1982). To establish fraud, the party objecting to the registration must produce clear and convincing evidence of a deliberate attempt to mislead the PTO into registering the trademark. *Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, 670 (7th Cir.1982). The Lanham Act, however, does not require a federal registrant to investigate and report to the PTO all other possible users of a similar mark. *Id.* at 671. Rather, the registrant will be found to have acted fraudulently if, at the time he signed the statutory oath in the application for federal registration, he actually possessed knowledge of the existence of another person's right to use that mark in commerce. *Id.* at 672. In Cacique's application to register RANCHERO, it stated in its oath that it did not have knowledge of another person's right to use a similar mark. V & V offers no evidence that Cacique in fact knew of the existence of V & V's RANCHERITO trademark at the time it filed its oath. Even if Cacique later became aware of the RANCHERITO mark, Cacique had no duty to inform the PTO of any similar mark that it discovered after signing the oath. *Id.* at 671. Therefore, V & V has failed to establish by clear and convincing evidence that Cacique procured its trademark through fraud.

### 2. *Prior Use*

■ V & V also claims that its prior use of the RANCHERITO trademark should have precluded Cacique's federal registration of the confusingly similar RANCHERO trademark. V & V observes that rights to a particular trademark generally arise from prior use rather than registration. *See Volkswagenwerk Aktiengesells-* *chaft v. Wheeler*, 814 F.2d 812, 815 (1st Cir.1987). Nonetheless, if a second business adopts the same or a similar mark in good faith, prior use does not prevent the subsequent user from using its trademark in an area that is geographically remote from the market appropriated by the first user. *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 408 F.Supp. 1219, 1239 (D.Colo.1976), *modified*, 561 F.2d 1365 (10th Cir.1977). A second user acts in good faith if he begins using the mark without knowledge of its prior use by someone else. *Money Store*, 689 F.2d at 674.

In the case at bar, it has already been established that Cacique applied for its RANCHERO trademark registration without knowledge of the existence of a similar mark in use elsewhere. Although the PTO did issue a federal registration for Cacique's mark, V & V was using the RANCHERITO trademark before Cacique obtained its registration. V & V's prior use in certain geographic markets, however, does not warrant complete invalidation of Cacique's federal registration. Cacique has the right to use its trademark "except to the extent that such use infringes what valid right [any previous users] have acquired by their continuous use of the same mark prior to [Cacique's] federal registration." *Burger King of Florida, Inc. v. Hoots*, 403 F.2d 904, 907 (7th Cir.1968); *see also Natural Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1395 (3d Cir.), *cert. denied*, 474 U.S. 920, 106 S.Ct. 249, 88 L.Ed.2d 257 (1985). This conclusion flows logically from a legal principle long recognized by the Supreme Court: Prior use of a trademark in a remote geographic area does not justify the cancellation of a second user's trademark rights acquired in good faith. *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 100, 39 S.Ct. 48, 51–52, 63 L.Ed. 141 (1918); *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 415, 36 S.Ct. 357, 361, 60 L.Ed. 713 (1916). Thus, V & V may contest Cacique's federal registration only to the extent that V & V had acquired common law rights prior to the publication date of the registration.

*Wrist-Rocket Mfg. Co. v. Saunders Archery Co.*, 578 F.2d 727, 731 (8th Cir.1978).[2]

■ Because Cacique applied for federal registration of its RANCHERO trademark in good faith, and the trademark was issued absent fraud, its federal trademark registration will not be completely invalidated solely based upon V & V's prior use of a confusingly similar trademark in certain geographic markets. Therefore, Cacique's motion for JNOV is granted.

#### B. Motion for the Court to Make Additional Findings

Cacique has requested this court to make additional findings with respect to the relative geographic rights of the parties to their trademarks pursuant to Fed.R.Civ.P. 49(a).[3] This court has determined that both parties are entitled to the use of their respective marks in commerce. Therefore, it is necessary to determine the extent of the parties' rights to specific geographic markets: "[G]eographically defined areas of exclusive use are required for each party in this situation to effectuate the will of Congress and meet the needs of business and the public." *Wrist-Rocket*, 578 F.2d at 731.

■ The only states where V & V has any chance of establishing common law rights to its trademark are Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Nebraska, New York, Ohio, Texas, and Wisconsin. These are the states in which V & V claims to have established its presence and customer base prior to Cacique's registration. Nevertheless, because Cacique has a valid federal registration, it is presumed to have exclusive rights to use that trademark throughout the United States, even in geographic areas in which it is not trading, *Allied Tel. Co. v. Allied Tel. Sys. Co.*, 565 F.Supp. 211, 216 (S.D.Ohio 1982), except in areas where V & V has established "contin-

uous prior use." 15 U.S.C. § 1115(b)(5) (1982); *see also Natural Footwear*, 760 F.2d at 1395 ("[A] federal registrant is still subject to the defense of a prior user of the mark who has established a market in specific markets notwithstanding that senior user's failure to register."). Thus, V & V has a defense to Cacique's federal registration only to the extent that it had established prior market penetration in certain markets. *See WNS, Inc. v. Deck The Walls, Inc.*, 4 U.S.P.Q.2d 1377 (N.D.Ill. 1987).

In determining the parties' respective rights, the *Natural Footwear* case provides some guidance. In that case, the court was confronted with determining the territorial rights of the parties when one party had federally registered and the other had prior use in certain markets. The two business entities in the case vied for the exclusive right to use the trademark ROOTS on their products. 760 F.2d at 1386. Roots, Inc., was a retail clothing company that sold clothing in several stores in northern New Jersey. Roots, Inc., also made sales to out-of-state customers through its limited mail order business. The other contending party was Natural Footwear Ltd., a footwear and apparel manufacturer which had registered its trademark, engaged in heavy advertising, and developed a high sales volume nationwide. *Id.* at 1386–87. Roots, Inc., claimed that because it had prior use of the mark, it had superior rights to the trademark despite Natural Footwear's federal registration. The court held that by virtue of its federal registration, Natural Footwear gained the full protection of the Lanham Act in all states except New Jersey. *Id.* at 1403–04. The court based its decision on the fact that in all other states outside of New Jersey in which Roots, Inc., claimed to have sufficient market penetration, the val-

**2.** The issue of the incontestability of Cacique's mark, so hotly contested by the parties, does not affect the legal analysis of V & V's claim. Regardless of whether or not the RANCHERO mark is incontestable under the Lanham Act, 15 U.S.C. § 1065, V & V's assertion of prior use does not provide sufficient grounds for canceling Cacique's registration.

**3.** Cacique has framed the issue in terms of determining the parties' *concurrent* rights to use their trademarks. Although each party will be using a similar mark, they each will have geographically defined markets of *exclusive* use.

ue of its gross sales and number of customers was "so small or sporadic that market penetration was *de minimis*." *Id.* at 1400. The court further stated that market penetration was *de minimis* because Roots, Inc., had neither established gross sales in excess of $5,000 nor a total of over 50 customers in any of these states during the relevant time period. *Id.*

Although Cacique would have this court adopt such an arbitrary sales figure to be applied in all cases for determining sufficient market penetration, this would not give a fair and accurate representation of a business entity's true participation in a given market. Gross sales and market share must be examined in light of the size of the market being served and the prospects for growth. In *Wrist-Rocket,* for instance, the court recognized that the products at issue, slingshots, were only of interest to a small segment of the general market. 578 F.2d at 732. The *Wrist-Rocket* court went on to state: "We have found no simple dollar amount or population-to-sales ratio that will apply across the board to products of different types, uses and durability and that appeal to different segments of the population." *Id.* Because the Mexican-style cheese being marketed in this case is directed at a limited market, i.e., Mexican-Americans, resort to any arbitrary sales figure to measure market penetration would be misleading.

The court in *Natural Footwear* did, however, set forth four factors which are helpful in determining whether a party has achieved sufficient market penetration in an area to warrant protection of its common law rights: "(1) the volume of sales of the trademarked product; (2) the growth trends (both positive and negative) in the area; (3) the number of persons actually purchasing the product in relation to the potential number of customers; and (4) the amount of product advertising in the area." 760 F.2d at 1398–99. Other courts have considered similar factors in determining market penetration. *See Weiner King, Inc. v. Wiener King Corp.,* 615 F.2d 512, 522 (C.C.P.A.1980); *Sweetarts v. Sunline, Inc.,* 380 F.2d 923, 929 (8th Cir.1967).

Applying the *Natural Footwear* factors to the instant case, this court finds that V & V has no rights in the New York, Florida, and Texas markets. Despite the large number of potential Hispanic customers in those markets, V & V's advertising and sales in those states are sparse or nonexistent. V & V has only one customer in New York City, none in Miami, and sales of less than $650 in each state prior to Cacique's registration. Moreover, there is no evidence of any advertising by V & V prior to Cacique's registration. Thus, V & V does not have the requisite market penetration to establish common law rights in those markets.

In stark contrast, V & V has made significant commercial inroads in four midwestern states with small Hispanic populations: Illinois, Indiana, Michigan, and Wisconsin. Cacique concedes that V & V has established trademark rights in the Chicago metropolitan area, but contends that V & V has not achieved sufficient market penetration in the rest of the state of Illinois. On the contrary, V & V's sales and advertising throughout Illinois are substantial and show positive growth trends. Although most of the state's Hispanics live in or near Chicago, V & V has 162 customers outside the Chicago area, including 37 in various locations throughout the state. Given the limited size of the relevant market, V & V has made sufficient prior use of its trademark to establish common law rights in the Illinois market.

Although Illinois' neighboring states have even smaller Hispanic populations, V & V had made important progress in developing markets in these states even before Cacique's federal registration. In Indiana, V & V has 45 customers in cities such as Indianapolis, East Chicago, Bloomington, Fort Wayne, South Bend, and Lafayette. Similarly, V & V has at least 21 customers in Wisconsin's major markets of Milwaukee, Madison, Racine, and Kenosha. In Michigan, V & V has approximately 39 customers in various cities. Sales have increased each year to nearly $6,400 in 1986. Taking into account the small number of potential customers and limited

growth potential in these markets, this court concludes that V & V has achieved sufficient market penetration to establish trademark rights in these states.

■ Although V & V has claimed to have carried on business in several other states, there is no evidence of any significant sales or advertising level sufficient to support a claim of exclusive rights in those markets. "[A]dvertising alone or sporadic sales are insufficient to establish the requisite 'continuous prior use' of a trademark necessary to create trademark rights." *Quill Corp. v. LeBlanc,* 654 F.Supp. 380, 386 (D.N.H.1987).

V & V has established its common law rights to exclusive use of its RANCHERITO trademark only in Illinois, Wisconsin, Indiana, and Michigan. Cacique has the right to use its RANCHERO mark throughout the rest of the country by virtue of its federal registration. Therefore, in order to protect the territorial rights of the parties, and to minimize the amount of public confusion, Cacique is enjoined from using its RANCHERO trademark in Illinois, Wisconsin, Indiana, and Michigan, where V & V has common law rights to its RANCHERITO trademark. *See id.* at 385 ("[A] junior user can be enjoined from entering markets in which the senior user has acquired exclusive rights."). Furthermore, pursuant to Fed.R.Civ.P. 59(e), the judgment dismissing Cacique's counterclaim for infringement is hereby amended to enjoin V & V from using its RANCHERITO mark in any region outside of Illinois, Wisconsin, Indiana, and Michigan, where Cacique has superior rights.[4]

## II. *V & V's Motion for JNOV*

V & V has also moved for judgment notwithstanding the verdict, or alternatively, for a new trial with respect to that portion of the jury's verdict which found V & V's federal registration of CHIHUAHUA to be invalid. Specifically, V & V has asked this court to enter judgment that the CHIHUAHUA trademark is valid and that Cacique has infringed it.

The jury could only have found that CHIHUAHUA mark to be invalid for one of three reasons: if the mark was generic, 15 U.S.C. § 1064(c), geographically descriptive, 15 U.S.C. § 1052(e)(2), or obtained through fraud, 15 U.S.C. § 1064(c). Because the evidence adduced at trial failed to establish any reason for a verdict of invalidity, V & V's motion for JNOV is granted.

### A. Is the Mark Generic?

A federally registered trademark is prima facie evidence of the registrant's exclusive right to use that mark in commerce, 15 U.S.C. § 1115(a), and is entitled to "a strong presumption of validity." *Coca-Cola Co. v. Overland, Inc.,* 692 F.2d 1250, 1254 (9th Cir.1982). Further, this "general presumption of validity resulting from federal registration includes the specific presumption that the trademark is not generic." *Id.* Consequently, Cacique has a heavy burden to come forward with sufficient evidence in order to overcome this presumption.

In determining whether a registered trademark is generic, a court must look to "the primary significance of the registered mark to the relevant public." 15 U.S.C. § 1064(c) (Supp.1987). The initial inquiry, therefore, entails identifying the relevant purchasing public of CHIHUAHUA cheese, and determining the primary significance of the term CHIHUAHUA to those consumers.

The market for V & V's CHIHUAHUA product mainly consists of businesses with predominantly Mexican–American clientele. Purchasers of this cheese include independent grocers, larger grocery chains, and many Mexican–American restaurants. V & V's advertising is directed mainly at the Hispanic market, the relevant purchasing public of CHIHUAHUA cheese.

■ In order to invalidate the federally registered CHIHUAHUA trademark under 15 U.S.C. § 1064(c), Cacique was required to show that the Hispanic consumers of CHIHUAHUA cheese regard "CHIHUAHUA" as a generic term for a type of

4. Cacique has waived any claims to damages for infringement.

cheese. Cacique offered no evidence that American buyers of this type of cheese primarily associate the term CHIHUAHUA with cheese. Rather, Cacique merely offered evidence of the use of the term CHIHUAHUA in relation to cheese sold in Mexico (e.g., evidence of cheeses sold in Mexico under the name of CHIHUAHUA, a Mexican government standard for Chihuahua cheese, and a description of Chihuahua cheese in a cookbook). Nonetheless, the perception of CHIHUAHUA as a generic term for cheese in Mexico does not undermine the validity of V & V's federal registration in the United States. In determining whether a term is generic for purposes of United States trademark law, it is irrelevant how the mark is used outside the United States. *Anheuser–Busch Inc. v. Stroh Brewery Co.*, 750 F.2d 631, 642 (8th Cir.1984) (district court correct in not ascribing weight to whether the term "LA" was generic for low alcohol beer in Australia); *see also Seiko Sporting Goods USA, Inc. v. Kabushiki Kaisha Hattori Tokeiten*, 545 F.Supp. 221, 226 (S.D.N.Y.), *aff'd*, 697 F.2d 296 (2d Cir. 1982).[5] "The descriptiveness of the term is determined from the viewpoint of the relevant purchasing public." *In re Northland Aluminum Prods., Inc.*, 777 F.2d 1556, 1559 (Fed.Cir.1985). Therefore, whether or not CHIHUAHUA is a generic term for

cheese in Mexico has no probative value in determining its primary significance to cheese purchasers in the United States.

Evidence of the relevant consumers' perception of the term CHIHUAHUA may be provided by "any competent source, such as consumer surveys, dictionaries, newspapers, and other publications." *Id.* at 1559. V & V came forward with evidence from these sources which indicated that CHIHUAHUA is not a generic term for cheese in the United States. V & V presented several Spanish and English dictionaries and encyclopedias which made no connection between the term CHIHUAHUA and a type of cheese. V & V also presented the testimony of several witnesses (including a native Mexican who was a Spanish professor) who traveled extensively in Mexico and the United States. These witnesses failed to attach any significance to the term CHIHUAHUA as a description of a type of cheese. Finally, the fact that U.S. consumers more commonly associated the term CHIHUAHUA with a type of dog or an exclamation of surprise militates against the conclusion that the relevant market primarily perceives CHIHUAHUA as a generic term for cheese.

Because Cacique failed to come forward with any articles, consumer surveys, or other evidence of this nature indicating that CHIHUAHUA is a generic description

**5.** Cacique relies on several cases to the contrary. However, these cases are not applicable to the case at bar. The court in *Holland v. C. & A. Import Corp.*, 8 F.Supp. 259, 261 (S.D.N.Y.1934) stated that a term that is generic in another country "may not be appropriated here as a trade-mark" even though the term "had no significance to our people generally." That decision, however, was rendered before the amendment to the Lanham Act, 15 U.S.C. § 1064(c) (Supp.1987), which provides that a mark may be deemed generic only if the "relevant public" (in this case United States consumers) perceives the mark as generic. Consequently, *Holland* does not represent the current view of the law in light of the recent decisions set forth above.

Furthermore, Cacique's reliance on the decisions in *In re Le Sorbet, Inc.*, 228 U.S.P.Q. 27 (T.T.A.B.1985) and *Donald F. Duncan, Inc. v. Royal Tops Mfg. Co.*, 343 F.2d 655 (7th Cir.1965) is misplaced. In *In re Le Sorbet, Inc.*, the applicant tried to register the term LE SORBET. However, the word "sorbet" appeared in American and French dictionaries and 30 articles

from the NEXIS publications file as a definition for the very goods upon which the trademark was to be placed. 228 U.S.P.Q. at 29. Moreover, the registrant admitted that "sorbet" was a generic term. *Id.* Although the court in *Donald F. Duncan, Inc.* recognized that the trademark at issue (YO–YO) was generic in the Philippines, it went on to state that "there remains the issue as to whether 'Yo–Yo' in use became known to members of the public as the descriptive name of the toy." 343 F.2d at 662. Thus, that decision was not based solely on whether the term was descriptive in the Philippines, but also on whether "the public" (American consumers) understood it to be so. Evidence was presented which indicated that the term YO–YO was generic in the United States, that the president of the company admitted that the term was generic, and that he employed the term in a descriptive and generic sense. 343 F.2d at 662–68. The court concluded that the trademark was generic "by reason of the general acceptance by the public of 'yo-yo' as a descriptive name for the toy." 343 F.2d at 659.

of a brand of cheese, it has failed to overcome the presumption that the federally registered CHIHUAHUA trademark is not generic. Therefore, the jury could not have based its invalidation of the CHIHUAHUA trademark on a finding that the mark was generic.

### B. Geographic Descriptiveness

■ Cacique also sought to invalidate V & V's CHIHUAHUA trademark on the ground that it was geographically descriptive. The Lanham Act states that a registrant cannot obtain a valid registration of a term that is "primarily geographically descriptive or deceptively misdescriptive." 15 U.S.C. § 1052(e)(2) (1982).[6]

The test for determining whether a trademark is invalid based upon geographic descriptiveness is whether the public makes an association between the goods at issue and a particular geographic location. *In re Nantucket, Inc.*, 677 F.2d 95, 99 (C.C.P.A.1982). If the geographic meaning of the term is "minor, obscure, remote or unconnected with the goods," then the mark is not invalid. *In re Brauerei Aying Franz Inselkammer KG*, 217 U.S.P.Q. 73, 75 (T.T.A.B.1983). In addition, if a "well recognized" geographic term has other meanings "such that the term's geographical significance may not be the primary significance to prospective purchasers," then the trademark is not invalid. *In re Handler Fenton Westerns, Inc.*, 214 U.S.P.Q. 848, 850 (T.T.A.B.1982).

■ Cacique failed to provide sufficient evidence to establish that the CHIHUAHUA trademark should be invalidated based upon geographic descriptiveness.

Cacique did not provide any witnesses, surveys, or even a mere dictionary or encyclopedia reference that showed that the relevant public would make a goods/place association. Rather, Cacique merely presented a NEXIS printout which indicated that a regional Texas newspaper stated that cheese is produced in the Chihuahua region of Mexico. In light of the evidence brought forth by V & V, this NEXIS article is insufficient to invalidate the trademark. V & V introduced dictionary and encyclopedia references which indicated no immediate or primary connection between cheese and the Chihuahua region of Mexico. In fact, in discussing the Chihuahua region, these references did not even recognize cheese as a product emanating from that region. Several Mexican–Americans also testified that they had never heard of the term CHIHUAHUA used in connection with cheese. Furthermore, because CHIHUAHUA has other more common meanings (such as a type of dog or an exclamation of surprise) to prospective purchasers in this country,[7] it is unlikely that American consumers will primarily associate CHIHUAHUA cheese with a region in Mexico.

Cacique has failed to come forward with sufficient evidence to establish that the term CHIHUAHUA, when associated with cheese, is geographically descriptive. Therefore, the jury could not have based its invalidation of the CHIHUAHUA trademark on a finding of geographic descriptiveness.

### C. Fraud

■ Finally, Cacique asserts that V & V's CHIHUAHUA trademark was invalid

---

**6.** Cacique framed the issue in terms of primary geographic descriptiveness. Primary geographic descriptiveness, however, applies only to goods that originate from the place described. *In re Nantucket, Inc.*, 677 F.2d 95, 98 (C.C.P.A. 1982). Since V & V's cheese does not come from Mexico, the question is whether the mark is "primarily geographically deceptively misdescriptive"—namely, whether the consumer is misled into purchasing the product in the belief that it actually originates from that place. *Id.* Nevertheless, the result is the same in either case: The registration of the mark will be denied if it is geographically descriptive, whether

or not the product actually came from the place described. *Id.*

**7.** Just as Mexican opinion is irrelevant in analyzing whether the American public perceives a term as generic, evidence of the perception in Mexico of a goods/place association between CHIHUAHUA and cheese is irrelevant in determining whether the American purchasing public makes a goods/place association. *See In re Societe Generale Des Eaux Minerales De Vittel S.A.*, 824 F.2d 957, 960 (Fed.Cir.1987); *In re Brauerei Aying Franz Inselkammer KG*, 217 U.S. P.Q. at 75.

because V & V allegedly induced the PTO into issuing the trademark based upon material misrepresentations. As discussed earlier, in order to establish fraud, Cacique has the burden of proving by clear and convincing evidence that at the time V & V filed its oath for registration, it had knowledge of someone else's right to use the mark in commerce, and intentionally withheld or misrepresented information to the PTO, thereby deceiving the PTO into registering the trademark. *Money Store*, 689 F.2d at 670–72.

In the case at bar, there is not clear and convincing evidence of an intent to defraud the trademark examiner into registering the trademark. V & V provided the examiner with several authorities which described Chihuahua, Mexico. V & V even disclosed to the examiner two publications of a Mexican cook which described a type of Chihuahua cheese known in Mexico. Furthermore, V & V acted with complete candor in disclosing to the examiner the fact that certain people, including several alleged infringers of V & V's mark, considered CHIHUAHUA to be a generic name for a type of cheese. V & V also revealed that it had sued some of the alleged infringers in Illinois state court, and that all of these suits had been settled.

Nevertheless, Cacique claims that V & V acted fraudulently merely because of its failure to present a NEXIS computer printout to the trademark examiner. This printout cited an article from a local Texas newspaper which indicated that a type of cheese that was made in the Chihuahua region was sold in Mexico and the southwestern United States. This simply is not clear and convincing evidence of V & V's intent to defraud the PTO in light of all of the other material presented to the trademark examiner.

Because Cacique has failed to present sufficient evidence to show that V & V's CHIHUAHUA trademark was generic, geographically descriptive, or obtained by fraud, V & V's federal registration for CHIHUAHUA is valid. Therefore, the jury's verdict cannot stand, and V & V's motion for JNOV is granted.

## D. New Trial

Having found the CHIHUAHUA mark to be invalid, the jury never reached the issue of damages resulting from Cacique's infringement of V & V's rights to the mark. Now that this court has found the CHIHUAHUA trademark valid, V & V has a legitimate claim to relief based on Cacique's infringement. Consequently, this court grants V & V's motion for a new trial solely for the purpose of assessing the damages resulting from Cacique's infringement of V & V's CHIHUAHUA trademark.

## CONCLUSION

For the foregoing reasons, V & V's motion for JNOV with respect to its CHIHUAHUA trademark is granted. In addition, Cacique's motion for JNOV with respect to its RANCHERO trademark is granted. However, this court enjoins Cacique from using its RANCHERO trademark in Illinois, Indiana, Michigan, and Wisconsin, and also enjoins V & V from using its RANCHERITO trademark outside of Illinois, Indiana, Michigan, and Wisconsin. In addition, this court grants V & V's motion for a new trial solely for the purpose of determining the damages caused by Cacique's infringement of V & V's CHIHUAHUA trademark.

IT IS SO ORDERED.