**GIORGIO BEVERLY HILLS, INC., Plaintiff,**

v.

**REVLON CONSUMER PRODUCTS CORPORATION, Defendant.**

**No. 94 Civ. 6139 (KTD).**

United States District Court, S.D. New York.

Nov. 7, 1994.

Robin, Blecker, Daley & Driscoll, New York City, for plaintiff Giorgio Beverly Hills, Inc. (Marie V. Driscoll, of counsel).

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant Revlon Consumer Products Corp. (Arthur L. Liman, of counsel).

### MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge:

On August 26, 1994, Giorgio Beverly Hills, Inc. ("Giorgio"), filed a civil complaint alleging that Revlon Consumer Products Corporation's ("Revlon") use of the name "Charlie RED" in connection with its new line of fragrances infringes upon Giorgio's trademark in "RED", in violation of 15 U.S.C. §§ 1114, 1125(a) (Lanham Act §§ 32, 43(a)) and New York General Business Law § 368–d, and constitutes unfair competition under New York common law. Revlon counterclaimed for cancellation of Plaintiff's registered trademark in "RED". Subsequently, Plaintiff moved for a preliminary injunction restraining Revlon from using "RED" or any confusingly similar trademark in connection with the offer, distribution, promotion, advertising, or sale of fragrance products. A hearing on the preliminary injunction motion was held at which both parties presented exhibits and witnesses.

For the following reasons, Plaintiff's motion for a preliminary injunction is denied.

I.

Giorgio and Revlon are two of the most well-known producers in the fragrance industry. Revlon's Charlie and Giorgio's RED have each enjoyed a great deal of popularity and success in terms of sales.

During its first three years on the market, Giorgio's RED was the best selling fragrance brand, and it currently remains among the top five best-selling brands. To date, RED and its line extension RED for Men have generated over two hundred million dollars ($200,000,000), predominantly through sales in high-price department stores. The costs of advertising and promoting RED have exceeded ninety-five million dollars ($95,000,000). Giorgio has a registered trademark in both "RED" and "RED for Men".

The year 1973 marked the introduction of Charlie, which has become Revlon's most valuable fragrance mark. Since its introduction more than two decades ago, Charlie has generated approximately one billion dollars ($1,000,000,000) in sales, most of which are made through mass market stores. Nearly one hundred million dollars ($100,000,000) has been spent by Revlon to advertise Charlie. Furthermore, the original Charlie has spawned a line of Charlie fragrances, including Charlie Express, Charlie Madison Avenue, and Charlie White.

In July 1993, Revlon introduced "Charlie RED" into the European marketplace. Revlon's European advertising campaign juxtaposed the original Charlie, packaged in blue, with the new Charlie RED, packaged in red.

Inspired by its European successes with the launch of Charlie RED and what it dubbed the "relaunch" of original Charlie, Revlon decided to introduce Charlie RED to the American market this year. Revlon's strategy was the same as in Europe: to place original Charlie and Charlie RED side-by-side in advertising, as well as in store displays. In anticipation of the holiday season and the corresponding increased demand for fragrance products, Revlon launched Charlie RED in this country on September 1, 1994.

## II.

## DISCUSSION

■ A party seeking a preliminary injunction bears a two-part burden. First, the movant must demonstrate that it will suffer irreparable harm absent the requested injunction. In addition, the movant must also show either a likelihood of success on the merits, or that there exists a sufficiently serious question on the merits combined with a balancing of hardships weighing decidedly in the movant's favor. *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1038 (2d Cir.1992); *Standard & Poor's Corp., Inc. v. Commodity Exchange, Inc.*, 683 F.2d 704, 707 (2d Cir.1982).

### A. Lanham Act Claims

■ On a motion for a preliminary injunction involving §§ 32 and 43(a) of the Lanham Act, the movant can demonstrate both irreparable harm and the likelihood of success on the merits by showing a likelihood of significant consumer confusion or misunderstanding as to the source or sponsorship of the product(s) in question. *Bristol–Myers Squibb*, 973 F.2d at 1038; *Standard & Poor's*, 683 F.2d at 708. As set forth in *Polaroid Corporation v. Polarad Electronics Corporation*, eight factors are relevant in ·assessing the likelihood of confusion: (1) strength of the plaintiff's mark, (2) similarity of the plaintiff's and the defendant's marks, (3) competitive proximity of the products, (4) likelihood that the prior owner of the trademark will bridge the gap, (5) actual confusion, (6) intent of the defendant in adopting the mark (i.e. whether the defendant acted in bad faith), (7) quality of the defendant's product, and (8) sophistication of the consumers. 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). These factors apply to both non-competing and competing products. *Thompson Medical Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 214 (2d Cir.1985).

### 1. Strength of Plaintiff's Mark

■ The strength of a trademark depends on its ability to identify the particular source of a product, even if that source remains anonymous. *W.W.W. Pharmaceutical Co., Inc., v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir.1993). Two factors are relevant to a determination of the strength of a trademark: (1) inherent distinctiveness and (2) distinctiveness in the marketplace. *Id.* Inherent distinctiveness consists of four categories of marks: (1) generic marks, which are common descriptions and do not receive protection; (2) descriptive marks, which employ ordinary language to describe the characteristics of the product and receive protection only upon evidence that a secondary meaning for the mark has been established; (3) suggestive marks, which imply rather than literally describe the characteristics of the product, and which necessitate that the consumer utilize imagination, thought, and perception to determine the nature of the product; and (4) arbitrary or fanciful marks, which receive protection even absent any evidence that a secondary meaning for the mark has been established. *Id.*

■ Giorgio's "RED" mark cannot be considered generic or descriptive. Plaintiff's product carries a golden hue. The bottle the product is contained in is clear. Only the external trade dress is colored red. Hence, the word "red" identifies no physical characteristic of the product itself, and its use as a mark is neither generic nor descriptive.

■ As discussed more fully below, the word "red" and the color it represents have certain connotations and elicit certain emotions which Plaintiff wants consumers to associate with its product. Giorgio is not the first company to utilize the word and/or color red, and cannot claim that it created or cultivated their connotative meanings, even with regard to the perfume market alone. (*See* Karp Aff. Ex. A) (trademark search uncovering more than 25 current or former fragrance products incorporating "red" dating back to 1930s). Because of its connotative meanings, "red" has developed a certain traditional significance which has proven particularly adaptable to fragrance products, and has been so adapted for decades. (*See* Karp Aff. Ex. A.) As a result, Giorgio's mark "RED" is not arbitrary or fanciful. *Cf. Nina Ricci, S.A.R.L. v. Gemcraft Ltd.*, 612 F.Supp. 1520, 1527 (S.D.N.Y.1985) ("L'Air" is mark

"particularly appropriate for fragrances," thereby reducing strength of the plaintiff's mark "L'Air du Temps" to weak suggestive).

The color red traditionally evokes romance, passion, love, and other strong emotions. These connotations at least partially inspired Giorgio to adopt the word "RED" for its mark. According to Giorgio's former president and chief executive officer, and also according to its current president, the company "chose the name Red because the color is vibrant and dramatic and it's also associated with passion and romance. While the actual fragrance is subtle, the color is definitely sexy." (Karp Aff. Ex. D).

The mark "RED" invites the consumer to employ a bit of perception, thought, and imagination, to reach the conclusion that Giorgio's fragrance is romantic, passionate, and sexy, and/or that the consumer will elicit the corresponding emotions from others when wearing the fragrance. *Compare Elizabeth Taylor Cosmetics v. Annick Goutal,* 673 F.Supp. 1238, 1243 (S.D.N.Y.1987) (imagination required to connect emotion to fragrance). Because it implies the characteristics of Giorgio's product, "RED" is a suggestive mark. *Compare Nina Ricci, S.A.R.L.,* 612 F.Supp. at 1527 ("L'Air" is suggestive rather than arbitrary) *with Elizabeth Taylor Cosmetics,* 673 F.Supp. at 1243–44 (despite frequent use in fragrance advertising, "passion" is suggestive mark rather than descriptive).

However, classification as a suggestive mark does not automatically render the mark a strong one. *W.W.W. Pharmaceutical,* 984 F.2d at 572. Public identification of the mark with a certain product may also be considered in determining the strength of a mark. *Id.* at 573. Various factors may be examined to prove the existence of secondary meaning, including advertising expenditures, amount of sales, unsolicited media coverage, and length and exclusivity of the plaintiff's use of the mark. *Thompson Medical Co.,* 753 F.2d at 217 (citations omitted). To prove that "RED" has acquired such a secondary meaning, Plaintiff mentions its expenditures of over $95,000,000 for advertising and promotion, (Gray Aff. ¶ 8), as well as distribution of millions of samples and scent strips. (Gray Aff. ¶ 9.) Moreover, sales of RED and RED FOR MEN average an impressive $50,000,000—$100,000,000 annually. (Gray Reply Aff. ¶ 9.) Plaintiff also points out numerous press articles and television segments about RED. (Gray Aff. ¶ 6, Ex. 5.) While these assertions do not necessarily establish the public's identification of "RED" with Giorgio's fragrance, they do raise a presumption that at the very least some consumers associate the mark with Giorgio's product.

No evidence has been offered to refute Giorgio's contention that it alone has registered and used the single word "red" as a unitary mark for fragrances. However, Giorgio's use of "RED" has been exclusive only to this limited extent. Numerous fragrances have borne composite marks incorporating the word "red". (Karp Aff. Ex. A.) Some of these marks were in commerce and/or registered as early as the 1930s. (Karp Aff. Ex. A.) Composite marks incorporating "red" were thus in existence at least five decades before Giorgio received the "RED" mark through an assignment, and at least four decades before Giorgio's assignor had begun using the mark in commerce. (Karp Aff. Ex. A.)

Therefore the strength of Giorgio's mark "RED" will vary depending on whether the allegedly infringing mark is unitary or composite. By virtue of its mark being the only one consisting of the single word "red", Giorgio seems to have a strong suggestive mark when measured against other unitary marks. With regard to composite marks, Giorgio's "RED" is only weak suggestive due to the long history of multi-word marks incorporating the word "red". In the composite mark context, then, "RED" enjoys less than the full protection available. *Cf. Plus Products v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1005–06 (2d Cir.1983) ("Plus" is weak suggestive mark); *Nina Ricci, S.A.R.L.,* 612 F.Supp. at 1527 ("L'Air" is weak suggestive).

Defendant's mark is a composite, as will be discussed more fully in Section II.A.2, *infra.* Thus, for purposes of this motion, "RED" is only a weak suggestive mark.

I now turn to the remaining factors to determine whether, in this instance, Giorgio's mark deserves protection under this standard.

### 2. Similarity of the Marks

■ Plaintiff claims that Revlon's fragrance bears a unitary mark "RED" which is similar to its own. According to Giorgio, the placement of Revlon's own name on the product below the mark "RED" does not excuse the infringement, but rather worsens the effects by appropriating Giorgio RED's goodwill for Defendant. Giorgio's argument begins with the incorrect factual premise that Revlon's fragrance bears a unitary mark.

■ Giorgio's conclusion would require that the mark "RED" on Defendant's product be examined separately and distinctly from the markings "Revlon" and "Charlie", which also appear on the product. To dissect Revlon's mark in this way would create a false, fragmentary image. *Thompson Medical Co.*, 753 F.2d at 218; *Girl Scouts v. Bantam Doubleday Dell Pub.*, 808 F.Supp. 1112, 1124 (S.D.N.Y.1992). To properly gauge similarity, the overall impression given by a mark in the framework in which it is presented must be examined. *Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir.1993); *Universal City Studios, Inc. v. Nintendo Co. Ltd.*, 746 F.2d 112, 117 (2d Cir.1984). This framework includes the "visual appearance of each mark in the context of its use." *Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 735 (2d Cir.1991).

Revlon's mark is not "RED", "RED by Charlie", or "RED by Revlon". The mark is "Charlie RED". This mark may be interpreted either literally as the name "Charlie RED", or as the red version of Charlie. Thus, Defendant's product bears a composite mark which includes the word "red" and is comparable to the many fragrance products that have been sold for decades under other composite marks also incorporating the word "red". (*See* Karp Aff. Ex. A.)

As I have suggested in the past, a defendant's use of its own well-known mark in conjunction with the specific mark of its product can serve to ensure that there arises no consumer confusion about the source of that product. *Clairol, Inc. v. Cosmair, Inc.*, 592 F.Supp. 811, 816 (S.D.N.Y.1984). *Accord Bristol–Myers Squibb*, 973 F.2d at 1047; *Pristine Industries, Inc. v. Hallmark Cards, Inc.*, 753 F.Supp. 140, 145 (S.D.N.Y.1990). The fact that "Charlie" is a well-known mark has not been challenged by Giorgio. Moreover, Revlon has attached its own name to its own mark, the composite "Charlie RED"— not to Giorgio's mark "RED". The appearance of Defendant's name on the product serves to appropriate for itself the goodwill which attaches to its own Charlie fragrances, of which Charlie RED is one version. The inclusion of Defendant's trade name also ensures that consumers experience no confusion in identifying the source of Charlie RED as Revlon.

Visually, Plaintiff's mark and Defendant's mark bear only two superficial similarities: the color of the trade packaging on which each is presented, and the block letter format in which the word "red" is written on each. The packaging for RED is cherry red, while Charlie RED is sold in a darker brick or blood red packaging. The difference between the two colors is negligible. Also, the word "red" on the boxes and fragrance bottles of both products is written in capital block letters. In Giorgio's RED, the "R" is slightly larger than the other two letters, whereas in Charlie RED all of the letters in "RED" are the same size. Furthermore, on Giorgio's product the block letters are slightly more fancy, as opposed to the squared-off letters on Charlie RED. Despite these minor differences, the two letter styles appear similar.

In all other respects, the two products present vastly different overall impressions. Because all of the lettering on Giorgio's box is gold, the size of the lettering casts emphasis on the mark "RED", which is substantially larger than any other word on the box.

By contrast, on Defendant's box the mark "Charlie" is written in a white script which stands out in contrast to the red background. Immediately beneath "Charlie" is a white line curved in a backward-S pattern. Behind these white markings, a much larger script-letter "Charlie" and backward-S curve are

drawn in dark brick red coloring, serving as background shadowing.

Beneath "Charlie" is the word "RED", written in much less noticeable block letters. Moreover, "RED" is written in a pinkish-red color which blends into the red background of the packaging. Thus, "RED" is de-emphasized on Defendant's packaging. Beneath "RED" is Defendant's mark "REVLON", written in slightly fancier block letters, and colored the same contrasting white as "Charlie".

Reaching across almost the entire length of the box, "Charlie" is at least twice as long as the word "RED" beneath it. Some of the letters in "Charlie" are the same height as those in "RED", but the C, h, and l stand nearly twice as high. "REVLON" is written in letters approximately one-half the size of those in "RED". "RED" is only the length of three of the letters in "Charlie" above it, and is only approximately two-thirds the length of "REVLON" beneath it.

All of the components on Defendant's box—from the style and size of the lettering to the color scheme—serve to highlight the word "Charlie" and emphasize that the product is first and foremost a Charlie fragrance. This presentation stands in marked contrast to Giorgio's packaging, which is designed to emphasize the mark "RED". The length of the word "Charlie" and its white coloring also emphasize that Revlon produces this Charlie RED fragrance.

Thus, the overall impression made by Revlon's mark as it appears on its packaging does not appear similar enough to that of Giorgio to raise the likelihood of consumer confusion regarding the nature or source of the product.

The same conclusion applies to the overall impression made by Revlon's mark as it appears on its fragrance bottles. Giorgio's bottles display the same lettering style, proportional size, and coloring as on the external packaging. Giorgio's bottle itself is a clear parallelogram with a gold cap. Revlon's bottle is a shaped like an elongated triangle, and is made of frosted glass with a cylindrical silver cap. While the word "RED" is written in the same white coloring as "Charlie", the marks are written in the same lettering style and proportional size as on the external packaging. Revlon's name does not appear on the face of the bottle. Despite the differences in appearance between the bottle and the external packaging, the size and style of the words on the bottle emphasize "Charlie". Moreover, on the top of the bottle cap, the single word "Charlie" appears in the same flowing script as elsewhere. Therefore, from a top view, the only impression a consumer could form is that the bottle contains a Charlie product.

Like the external packaging, the overall impression made by Revlon's mark as it appears on its fragrance bottles is not similar enough to that of Giorgio to raise the likelihood of consumer confusion regarding the nature or source of the product.

3. Competitive Proximity of the Products

■ Where two products compete with each other, the likelihood increases that the use of similar marks will cause consumer confusion. *Lang v. Retirement Living Pub. Co., Inc.,* 949 F.2d 576, 582 (2d Cir.1991). While simply occupying the same field does not necessarily render products proximate, a similar purpose for those products might do so. *Id.* Differences in the channels of trade and the kinds of purchasers of each product also factor into the determination of proximity. *See Elizabeth Taylor Cosmetics,* 673 F.Supp. at 1246.

■ Although RED and Charlie RED are both fragrances, they are sold in different channels of trade. Plaintiff argues that both products will be advertised on television and in similar print media. This argument does not compel a finding of proximity, because the same claim could be made of almost any product which is publicly advertised.

Of more relevance is the nature of the consumers and the channels of trade of both products. According to Giorgio, the ages of consumers of each product significantly overlap, from ages 18–49 for users of RED to ages 16–30 for Charlie RED. (Pl. Reply Br. at 10.) However, RED seems to sell to a consumer who is willing to spend more money for a fragrance than is the consumer of

**184**

Charlie RED. Giorgio, indeed, argues that RED is an "upscale and generally expensive fragrance." (Pl. Reply Br. at 11.) Revlon notes that at least one of Giorgio's RED products sells for more than six times the price of Charlie RED. (Def.Mem.Opp.Mot.Prelim.Inj. at 61.)

As for the channels of trade, Giorgio RED is sold in the more exclusive department stores. · On the other hand, Charlie RED is more of a "mass-market" fragrance which is sold in corresponding outlets. *Cf. Elizabeth Taylor Cosmetics*, 673 F.Supp. at 1246 (no proximity found where one fragrance sells in mass department store outlet while the other sells in more exclusive stores). Nevertheless, Plaintiff claims that diversion of its products into mass merchandise outlets either does or will result in competition between its product and Charlie RED. However, Plaintiff's evidence on the effects of diversion is predominantly general and inconclusive. The most that Plaintiff has established is that there exists a slight problem due to diversion. *See Plus Products*, 722 F.2d at 1008. While diversion may eventually prove relevant, the evidence offered by Plaintiff at this time is insufficient to support a finding of market proximity.

Although the nature of the products are similar, the evidence regarding channels of trade and types of consumer are in dispute. The proximity factor is therefore either neutral or only slightly in favor of Plaintiff.

### 4. Bridging the Gap

■ This factor takes into account the likelihood of the plaintiff expanding its product into the defendant's market. The plaintiff's intent is relevant to this consideration. *See W.W.W. Pharmaceutical Co., Inc.*, 984 F.2d at 574 (lack of evidence of intent to expand justified finding of reduced likelihood of confusion); *Gruner + Jahr USA Pub.*, 991 F.2d at 1078–79 (emphasizing lack of intent to expand).

■ On both direct and cross examination, Giorgio's president Linda LoRe acknowledged that Giorgio does not intend to expand its sales of RED into the mass-market, and desires to end the diversion of its product into the mass-market stores where Charlie RED is sold. (Tr. of Hearing, October 4, 1994, at 17, 41–2.) The ages of the targeted consumers of each product, as well as the diversion element might raise the question of whether the gap has already been bridged. However, as noted in Section II. A.3, *supra*, the evidence regarding both the type of consumer and channels of commerce is inconclusive.

To the extent that there is any overlap, the evidence of bridging the gap is either neutral or only slightly in favor of Plaintiff.

### 5. Actual Confusion

■ Evidence of actual consumer confusion provides a strong indication of the likelihood of confusion. *Schieffelin & Co. v. Jack Co. of Boca, Inc.*, 850 F.Supp. 232, 245 (S.D.N.Y.1994); *Elizabeth Taylor Cosmetics*, 673 F.Supp. at 1247. Nevertheless, as I recently noted, such evidence is not necessary to prevail on a Lanham Act claim. *Cadbury Beverages, Inc. v. Cott Corp.*, 850 F.Supp. 256, 259 (S.D.N.Y.1994). Actual confusion may be difficult to prove when the allegedly infringing product has not been on the market for a significant period of time. *Nina Ricci, S.A.R.L.*, 612 F.Supp. at 1529.

■ Giorgio has presented no evidence of actual confusion.[1] Instead Giorgio argues that it cannot make such a showing because Revlon has not yet begun marketing Charlie RED in the United States. Revlon has promoted and sold Charlie RED in Europe for over one year, though. As with the domestic market, Giorgio has failed to present any evidence of actual confusion in the European markets. The lack of evidence of confusion abroad is a relevant consideration. *Jim Beam Brands v. Beamish & Crawford*, 852 F.Supp. 196, 200 (S.D.N.Y.1994). Neverthe-

---

**1.** The parties devoted significant attention in their papers and at oral argument to a survey commissioned by Revlon, the results of which indicated confusion among only a very small percent of those individuals surveyed. However, to succeed on this factor, Plaintiff must make at least some showing of actual confusion. Defendant need not affirmatively prove a lack of confusion, and Plaintiff cannot prove actual confusion merely by discrediting Defendant's proof of the lack of confusion.

less, as Plaintiff points out, the European markets for RED may not mirror their American counterpart. In turn, the lack of confusion abroad might not be a valid indicator of lack of confusion in the domestic market. Therefore, while the lack of evidence of actual confusion favors Defendant, it does so only slightly.

### 6. Defendant's Intent

The relevant consideration regarding the defendant's intent is whether the defendant chose its mark with the purpose of either appropriating for itself the goodwill associated with the plaintiff's name and/or mark, or of capitalizing on consumer confusion between the two products. *Lang,* 949 F.2d at 583.

Although Revlon knew of Giorgio's mark "RED" prior to adopting the name "Charlie RED", there is no evidence that it intended to capitalize on the goodwill associated with either Giorgio or its fragrance RED. As noted in Section II.A.2, *supra,* Revlon has placed its own trade name prominently on its product's trade dress. Clearly, the prominent placement of a trade name on packaging may evidence an affirmative attempt to avoid confusion. *Clairol,* 592 F.Supp. at 817. The trade dress also emphasizes the well-known mark "Charlie", while de-emphasizing the word "red". This packaging is an apparent attempt to avoid confusion with other "red" products, and also to capitalize on the goodwill established by the Revlon trade name and its own mark "Charlie".

Further, Revlon's marketing and advertising campaign places the original Charlie, in a blue trade dressing, directly next to the new Charlie RED. This juxtaposition appears intended to attract customers to Charlie RED by virtue of the goodwill attached to the original Charlie, as well as to re-attract customers to the original fragrance by virtue of its close proximity to the new displays for Charlie RED. Like its trade packaging, Revlon's advertising campaign appears designed to avoid confusion between its Charlie RED and other "red" products.

Revlon seems to have intended to avoid confusion between Charlie RED and other products, including Plaintiff's RED. In addition, Revlon seems to be attempting to capitalize upon its own established goodwill in promoting Charlie RED, rather than appropriating that of Giorgio and/or its RED. Therefore, I cannot find that Revlon has acted in bad faith.

### 7. Quality of Defendant's Product

Giorgio expressly disavows any claim that Charlie RED will be of poor quality. There is no other independent indication that Charlie RED will be anything but of adequate quality. As a result, this factor favors Defendant.

### 8. Sophistication of Consumers

The more sophisticated the ordinary purchaser of a product is, the less likely it is that the use of similar marks or trade dress will lead to confusion. *Bristol–Myers Squibb,* 973 F.2d at 1046. While generalizations about broad groups of people are always open to dispute, it has been acknowledged that women tend to be sophisticated purchasers of perfume, as opposed to men who tend to be less sophisticated in this area. *Elizabeth Taylor Cosmetics,* 673 F.Supp. at 1247 (citing *Nina Ricci S.A.R.L.,* 612 F.Supp. at 1529–30). Connie Gray, one of Giorgio's marketing managers who has been involved with the company's RED line of fragrances, expressed this same opinion on direct examination. (Tr. of Hearing, October 5, 1994, at 71.) Because the primary target group for these fragrance products is women, with men purchasing them mainly as gifts, (Tr. of Hearing, October 5, 1994, at 71), it would be fair to assume that the majority of ordinary purchasers of RED and Charlie RED are women who tend to be more sophisticated consumers. Therefore, this factor favors Defendant slightly.

### 9. Summary of Polaroid Factors

Giorgio's "RED" is a weak suggestive mark with regard to other composite marks bearing the word "red", like Defendant's "Charlie RED". The only factors which might offer slight support for Plaintiff are proximity of the products and bridging the gap. On the other hand, excluding two

superficial similarities, the visual appearance of Plaintiff's and Defendant's external trade dressings and fragrance bottles are not similar enough to raise the likelihood of consumer confusion regarding the nature or source of the products. Moreover, the consumers are presumed to be fairly sophisticated; Plaintiff offers no evidence of actual confusion; Plaintiff does not dispute the quality of Charlie RED; and Revlon did not act in bad faith when it adopted the mark "Charlie RED". Thus, the *Polaroid* factors weigh in favor of Defendant and against a likelihood of confusion. Plaintiff, thus, has failed to demonstrate both irreparable harm and a likelihood of success on the merits.

### B. State Law Claims

Giorgio also asserts claims based on dilution, pursuant to N.Y.Gen.Bus.L. § 368–d, and common law unfair competition.

■■■ There are two elements to a dilution claim in New York: (1) distinctiveness of the mark or the acquisition of secondary meaning, and (2) likelihood of dilution. *W.W.W. Pharmaceutical Co.,* 984 F.2d at 576–77 (citations omitted). Some courts treat predatory intent as a third element, whereas other courts treat it merely as a relevant consideration. *Parenting Unlimited v. Columbia Pictures T.V.,* 743 F.Supp. 221, 231 n. 17 (S.D.N.Y.1990). The first element has been satisfied, because RED is a suggestive mark for which there is an inference of a secondary meaning. *Supra* at II. A.1. However, there is no likelihood of dilution because Revlon's use of the mark Charlie RED neither blurs product identification, *see supra* at II.A.2, nor tarnishes any "affirmative association that [a] mark has come to convey." *W.W.W. Pharmaceutical Co.,* 984 F.2d at 577; *see supra* at II.A.2,7. Finally, Revlon has not acted with bad or predatory intent. *Supra* at II.A.6. Having failed to satisfy the second and third elements, Plaintiff has not demonstrated a likelihood of success on its dilution claim.

■■■ Giorgio also seeks a preliminary injunction on the basis of unfair competition. Under the New York common law, the plaintiff must prove either actual confusion in an action for damages, or a likelihood of confusion in an action for equitable relief. *W.W.W. Pharmaceutical Co.,* 984 F.2d at 576 (citing *Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc.,* 618 F.2d 950, 953, 955 (2d Cir.1980), *cert. denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982)). Plaintiff has proven neither actual confusion nor the likelihood of confusion. Thus, Giorgio has failed to demonstrate a likelihood of success on the merits of its unfair competition claim.

### C. Balance of Hardships

The fact that Plaintiff has not sufficiently demonstrated the likelihood of confusion sufficient to support its Lanham Act and common law unfair competition claims, and also has failed to show a likelihood of success on its dilution claim, helps tip the balance of hardships in Defendant's favor.[2] Giorgio's entire basis for arguing hardship arises from the alleged confusion and dilution which will occur if Revlon is allowed to proceed with its plans to market Charlie RED. However, the preceding discussion contradicts Giorgio's claim. On the other hand, should an injunction issue, Revlon would be stifled in its plans to launch Charlie RED. By virtue of the planned synergistic campaign linking the two Charlie fragrances, the relaunch of the original Charlie would be stalled as well. Occurring almost immediately prior to the holiday season, such a restraint could result in losses to Revlon of potentially tens of millions of dollars. As a result, a balancing of the equities favors Defendant.

### III.

### CONCLUSION

With regard to its claims under the Lanham Act §§ 32 and 43(a), N.Y.Gen.Bus.L. § 368–d, and common law unfair competition, Plaintiff has failed to demonstrate a likelihood of success on the merits. In addition,

---

**2.** Giorgio's "second comer" argument likewise fails due to its inability to sufficiently demonstrate a likelihood of consumers confusing Char-

lie RED with RED, as discussed in Section II.A. *supra.*

Plaintiff has not illustrated the existence of a sufficiently serious question on the merits combined with a balancing of hardships weighing decidedly in its favor as to any of its claims. Because of these determinations, Defendant's affirmative defense of laches need not be addressed.

Based on the foregoing, Plaintiff's motion for a preliminary injunction is denied.

SO ORDERED.