OTOKOYAMA CO. LTD., a Japanese
Corporation, Plaintiff,

v.

WINE OF JAPAN IMPORT, INC., a New
York Corporation, and Does 1 through
50, inclusive, Defendants.

No. 97 Civ. 5031.

United States District Court,
S.D. New York.

Nov. 14, 1997.

As Amended Nov. 20, 1997.

Nancy J. Deckinger, Arlana S. Cohen, Mark J. Speciner, Liddy, Sullivan, Galway, Begler & Cohen, P.C., New York, NY, for plaintiff.

Michael A. Cornman, Meyer Gross, Schweitzer, Cornman, Gross & Bondell, New York, NY, for defendants.

### OPINION AND ORDER

BAER, District Judge.

Plaintiff Otokoyama Co. Ltd. ("OCL"), a Japanese corporation, moves for a preliminary injunction preventing defendant Wine of Japan Import, Inc. ("WOJI"), a New York corporation, from infringing on plaintiff's trademark "Otokoyama" through the unauthorized use of that trademark in connection with the sale, advertisement, production and/or distribution of sake in the United

States. For the reasons stated below, the plaintiff's motion is granted.

## I. *Background*

Since 1984, OCL has distributed and sold sake (a mildly alcoholic Japanese beverage made from fermented rice) using the trademarks "Otokoyama" and the Japanese character notations denoting the term "Otokoyama", for which it owns the federal trademark registrations.[1] During the past 13 years, OCL has been the sole user of the Otokoyama trademarks in connection with the sale and distribution of sake in the U.S. In late March 1997, OCL became aware that WOJI began advertising, distributing and offering for sale sake under the name "Mutsu Otokoyama." On April 2, 1997, OCL's attorneys and attorney's for OCL's exclusive dealer wrote to WOJI to demand that it cease and desist the importation, distribution, advertisement and sale of the Mutsu Otokoyama sake. WOJI responded that it believed plaintiff's trademarks were invalid, and continued to offer its sake for sale. OCL subsequently brought this action for trademark infringement, unfair competition, and false designation of origin, arising under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, as well as state law claims. OCL now moves for a preliminary injunction, preventing defendant from infringing on its Otokoyama trademark. An evidentiary hearing was held on October 20, 1997.

## II. *Discussion*

In order to prevail on its preliminary injunction motion, plaintiff must establish (1) "either a likelihood of success on the merits or sufficiently serious questions going to the merits ... and a balance of hardships tipping decidedly in the moving party's favor" and (2) that it will suffer irreparable injury. *Clinique Laboratories, Inc. v. Dep Corp.*, 945 F.Supp. 547, 550 (S.D.N.Y.1996). In a trademark action, in order to satisfy the first prong, a likelihood of success on the merits or sufficiently serious questions going to the merits, the movant must first establish that it has a valid mark. *See Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503 (2d

Cir.1997). Once the validity of the mark is established irreparable harm and the likelihood of success on the merits may be established by showing a likelihood of significant consumer confusion or misunderstanding as to the source or sponsorship of the product in question. *Giorgio Beverly Hills v. Revlon Consumer Products Corp.*, 869 F.Supp. 176, 180 (S.D.N.Y.1994).

### A. Valid Mark

The first issue therefore is whether plaintiff has a valid mark. Defendant contends that plaintiff has no valid mark and that its trademark registrations, obtained under improper circumstances, should be canceled. Specifically, defendant alleges that when plaintiff applied for its trademark registration, the U.S. Patent & Trademark Office ("PTO") asked for an English translation of the foreign word "otokoyama." In response, plaintiff informed the Examiner that the mark was fanciful or arbitrary and could not be translated. Defendant argues that plaintiff knew the term could be translated and misrepresented that it could not in order to secure the trademark registration in the U.S. The word "otokoyama" is a contrived term comprised of two Japanese words, "otoko" and "yama." While they can be literally translated to mean "man" and "mountain," respectively, that revelation hardly supports defendant's view that the plaintiff's statement was patently false. There is no evidence that OCL intended to mislead the trademark Examiner when it stated that the mark itself could not be translated.

WOJI also argues that OCL knew at the time it submitted its trademark application that the word "otokoyama" is a descriptive or generic term in Japan for a particular ancient type of dry, manly sake, but failed to disclose this to the trademark Examiner. It contends that this knowledge is evidenced by OCL's advertising brochure, (Plaintiff's Exh. L), which states "Otokoyama, a variety of high-quality sakes, ..." and refers to otokoyama as a "high-quality sake backed by 340 years of tradition." As further evidence of

---

1. Plaintiff owns four trademark registrations: one for the Japanese character for the word "otokoyama," one for a stylized form of the word "otokoyama," one for another stylized form of the word "otokoyama" and one for the word "otokoyama."

this knowledge, WOJI points to the Japanese Trademark Office's denial of OCL's trademark in Japan, which stated that the term "otokoyama" is "a customary written statement of the goods."

OCL's brochure, however, does not demonstrate that the term "otokoyama" refers to a particular variety of sake; OCL's brochure simply refers to the many types of sake OCL offers for sale under the Otokoyama trademarks. The brochure itself advertises four different types of sake offered for sale by OCL under the Otokoyama trademarks in the United States.[2] More importantly, even assuming that "otokoyama" is in the public domain and means simply, as defendant contends, a variety of dry, manly sake in Japan, this fact is irrelevant to the U.S. PTO's determination of OCL's trademark rights. *See Seiko Sporting Goods U.S.A., Inc. v. Tokeiten,* 545 F.Supp. 221, 226 (S.D.N.Y.1982), *aff'd,* 697 F.2d 296 (2d Cir.1982). Therefore, plaintiff had no duty to disclose this information to the PTO. The decision of the Japanese Trademark Office is irrelevant and inadmissible in this action. *Vanity Fair Mills, Inc. v. T. Eaton Co. Ltd.,* 234 F.2d 633, 639 (2d Cir.1956), *cert. denied,* 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956); *see also, Noone v. Banner Talent Assocs. Inc.,* 398 F.Supp. 260, 263 (S.D.N.Y.1975). Accordingly, defendant has failed to establish a likelihood of success on the merits as to its claim that OCL's trademark should be canceled.[3]

**B. Likelihood of Confusion**

Since the defendant has failed to show that plaintiff does not have a valid mark, the next issue is whether the defendant's actions are likely to cause significant consumer confusion. The "likelihood of confusion" issue is governed by the eight-prong Polaroid test which instructs the court to consider the following factors: (1) the strength of plaintiff's mark, (2) the degree of similarity between the two marks, (3) the proximity of the products, (4) the likelihood that plaintiff will "bridge the gap", (5) actual confusion, (6) defendant's good faith, (7) the quality of defendant's product and (8) the sophistication of potential consumers. *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.1961), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

*1. Strength of Plaintiff's Mark*

"In determining the strength of [a] mark, [courts] look at its tendency to identify the goods ... sold under the mark as emanating from a particular, although possibly anonymous, source." *The Sports Authority, Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 960–61 (2d Cir.1996). There are four categories to gauge the strength of a mark: (1) generic, (2) descriptive, (3) suggestive and (4) arbitrary and fanciful. *Id.* at 961. Generic marks are entitled to no protection while arbitrary and fanciful marks are almost always considered strong marks. *Id.* If a mark is deemed descriptive or suggestive, the court considers whether it has acquired a secondary meaning. *Id.* at 960–61.[4]

Defendant argues that the trademark Otokoyama is descriptive or generic

---

**2.** OCL's reference to the 340 year tradition of sake in the brochure refers to the fact that otokoyama sake dates back to the Edo era, at which time otokoyama brand sake was sold by Momenya. In 1968, OCL acquired historical artifacts from the Momenya line, although it did not pay money for these artifacts. (See Declaration of Yoshiro Yamazaki ¶¶ 5–7; Transcript of hearing on Oct. 20, 1997 ("Tr.") at 56.).

**3.** Defendant's reliance on *Bart Schwartz International Textiles, Ltd. v. The Federal Trade Commission,* 129 U.S.P.Q. 258, 289 F.2d 665 (1961) is unavailing. In that case, the court held that where a trademark applicant made a statement that no other person had the right to use the trademark and knew this was false, such conduct warranted cancellation of the trademark. The court stated, however, that "[t]he mere withhold-

ing of information as to the meaning of the Italian word 'fiocco' is not such a fraudulent withholding of information as to warrant cancellation of the mark." Thus, even if OCL fraudulently withheld the meaning of the word "otokoyama," under Schwartz, this would not warrant cancellation.

**4.** While a suggestive mark does not require secondary meaning to be entitled to protection, *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70 (2d Cir.1988), secondary meaning is nonetheless relevant to the inquiry and a showing of secondary meaning increases the strength of such a mark. *See Giorgio Beverly Hills Inc. v. Revlon Consumer Products Corp.,* 869 F.Supp. 176, 181 (S.D.N.Y. 1994); *Frank Brunckhorst Co. v. G. Heileman Brewing Co.,* 875 F.Supp. 966 (E.D.N.Y.1994).

because the term "otokoyama" refers to an ancient variety of dry, manly sake which originated in Japan more than 300 years ago and which word is commonly used by at least 20 other brewers in Japan to identify this type of sake. However, as discussed above, the meaning of the term "otokoyama" in Japan is not relevant to this action. The issue here is what "otokoyama" means to *United States* consumers. While several brewers use the term "otokoyama" in Japan, there are only two companies that currently use the term "otokoyama" in the United States, plaintiff and defendant. The meaning of a term outside of the United States is irrelevant in the determination of whether or not the mark is entitled to protection under United States trademark laws.[5] *See V & V Food Products, Inc. v. Cacique Cheese Co., Inc.*, 683 F.Supp. 662, 669–70 (N.D.Ill.1988); *Seiko Sporting Goods U.S.A., Inc. v. Tokeiten*, 545 F.Supp. 221, 226 (S.D.N.Y.1982), *aff'd*, 697 F.2d 296 (2d Cir.1982); *see also, Osawa & Co. v. B & H Photo*, 589 F.Supp. 1163, 1171–72 (S.D.N.Y.1984). Here, defendant has failed to offer any consumer studies or other evidence to establish what the term "otokoyama" means to United States consumers. *See Heroes Inc. v. The Boomer Esiason Hero's Foundation Inc.*, 1997 WL, 335807 (D.D.C. June 6, 1997), *op. amended*, 96 Civ. 260 (D.D.C. June 16, 1997)(citing *H. Marvin Ginn Corp. v. Int'l Assoc. of Fire Chiefs, Inc.*, 782 F.2d 987, 990 (Fed.Cir. 1986)(to show a mark is generic, defendant must show, usually through consumer surveys, that the relevant public understands

the term to signify the services provided by the plaintiff).

Defendant nevertheless contends that since OCL's sake is marketed to a Japanese-born or Japanese-speaking population in the United States, the meaning of the term in Japan is nevertheless relevant here. However, WOJI's assertion regarding the composition of the sake market is not supported by the evidence. WOJI presented no studies to show what the composition of sake buyers in the United States are.[6] While WOJI presented some anecdotal evidence at the hearing that consumers of OCL's sake are Japanese speaking individuals, it was not persuasive. *See* Tr. at 31, 41–42. While defendant established that OCL's sake is heavily marketed to Japanese restaurants, there was no evidence as to the racial make-up or language employed by the clientele that frequent these restaurants. Clearly some and perhaps a majority are English speaking. The defendant has failed to establish that the term "otokoyama" is descriptive or generic for a variety of dry, manly sake.

■ OCL, on the other hand, argues that the mark is arbitrary because United States consumers have come to associate OCL's trademark exclusively with OCL's sake. Further, it contends that since "otokoyama" is a contrived term that has, no literal translation as a whole word, it is arbitrary. However, like WOJI, OCL offered no evidence, such as a consumer survey, to prove that U.S. consumers have come to associate OCL's trademark with its sake. Moreover,

---

5. The case cited by the defendant, *Holland v. C & A Import Corp.*, 8 F.Supp. 259 (S.D.N.Y.1934) is over sixty years old and has been superseded by statute. *V & V Food*, 683 F.Supp. at 670 n. 5. In addition, *In re Le Sorbet, Inc.*, 228 U.S.P.Q. 27, 1985 WL 71953 (T.T.A.B.1985) is distinguishable. In that case, the applicant attempted to register the term LE SORBET, but such registration was denied on the ground that the term sorbet is the generic name of the goods; however, the term "sorbet" was found to appear in American and French dictionaries, unlike the term "otokoyama," which appears in neither Japanese or American dictionaries. In addition, the registrant admitted that sorbet was a generic term. *Id.* at 29.

6. WOJI also contends that there is evidence that the word "otokoyama" means a variety of sake in

the United States since there are sake directories available in the United States that list several sources of otokoyama sakes available in Japan, including OCL's and WOJI's sakes. Def.'s Exh. 6. However, these directories simply list several types of sakes that are available in Japan and do not indicate what the term means to U.S. consumers. Moreover, plaintiff introduced a book entitled, "Sake, A Drinkers' Guide" into evidence which indicates that OCL's sake is a brand name not a variety of sake. This book contains a section on varieties of sakes, but Otokoyama is not listed in this section. Instead, OCL's sake is listed in a different section of the book containing pictures of various labels of good sakes. *See* Pl.'s Exh. G.

although the word "otokoyama" has no literal translation as one word, it does have a translation as two separate words, "man" and "mountain." The term thus connotes or can be loosely translated to mean "man mountain" or, in other words, "big man."

The question then is into what category plaintiff's mark falls. A mark is suggestive if it requires some "imagination, thought or perception to reach a conclusion as to the nature of the goods." *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir.1988). A mark is descriptive if it directly conveys the qualities, ingredients, effects or other features of the product naturally and in ordinary language. *Thompson Medical Co. Inc. v. Pfizer, Inc.*, 753 F.2d 208, 212 (2d Cir.1985). While the word "otokoyama" or "mountain man" may suggest masculine attributes that describe a hearty, manly sake, the mark requires some "imagination, thought or perception to reach a conclusion as to the nature of the goods," and therefore must be categorized as suggestive. *Hasbro*, 858 F.2d at 73.

Accordingly, the court looks to secondary meaning to analyze the strength of the mark. Secondary meaning exists when the mark used has come to indicate that the goods in connection with which it is used are the goods manufactured by the alleged owner. Guidelines include (1) advertising expenditures, (2) consumer studies linking name to source, (3) sales success, (4) unsolicited media coverage, (5) attempts to plagiarize the mark and (6) the length and exclusivity of the mark's use. *Hasbro*, 858 F.2d at 70. OCL has offered some evidence that its mark has developed secondary meaning. First, OCL has expended over $67,000 in advertising its product in the U.S. over the last five years. Tr. at 17. While this is not a large amount of money, OCL also offered evidence that it engages in many informal promotional activities with respect to the Otokoyama products, for which it spends large and increasing amounts of money each year. Tr. at 17–23, 45. Second, over the past 13 years, sales of OCL's sake have steadily increased (in 1984 it sold 2,052,000 milliliters of sake; in 1996, it sold 92,336,000 milliliters). Supp. Declaration of Jun Tanaka ¶¶ 3, 15. third, OCL's

sake has received unsolicited media coverage; for example, in 1994 the *Seattle Times* printed an article praising OCL's sake. Declaration of Nan Hoskins, Exh. A. Finally, OCL has been the exclusive user of the Otokoyama trademarks in the U.S. for the past thirteen years. Based or this evidence, the plaintiff has shown that its mark is relatively strong, but not entitled to the fullest protection available under the law. This factor thus weighs in favor of plaintiff.

### 2. Similarity of the Marks

"In considering this factor, [courts] look to two key questions: 1) whether the similarity between the two marks is likely to cause confusion and 2) what effect the similarity has upon prospective purchasers." *The Sports Authority*, 89 F.3d at 962. Marks will not be similar "for the purposes of assessing likelihood of confusion simply because they contain an identical or nearly identical word." *Mejia and Assocs. Inc. v. I.B.M. Corp.*, 920 F.Supp. 540, 547 (S.D.N.Y. 1996). In order to properly assess similarity, "the overall impression given by a mark in the framework in which it is presented must be examined." *Giorgio Beverly Hills, Inc. v. Revlon Consumer Products Corp.*, 869 F.Supp. 176, 182 (S.D.N.Y.1994). Therefore, it is proper to consider the "products' sizes, logos, typefaces, and package designs." *W.W.W. Pharmaceutical Co. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir.1993).

Here, both plaintiff's and defendant's "Otokoyama" appear in black all capital letters placed at the bottom of the label. Plaintiff's mark, however, is bordered by a red box and is in a different font than defendant's. *Internat'l Data Group v. J & R Electronics*, 798 F.Supp. 135, 139 (S.D.N.Y. 1992), *aff'd*, 986 F.2d 499 (2d Cir.1992) (marks not similar where race track border used around one mark and not around the other). Similarly, the Japanese character is in the middle of each label and is in black lettering. Again, however, on defendant's label the character is on a white background and is encircled in a dark color whereas plaintiff's lettering is set against a drawing of a rope and is not encircled. Furthermore, defendant's label has the word "Mutsu" be-

fore "Otokoyama." *See Lang v. Retirement Living Publishing Co.*, 949 F.2d 576, 581–82 (2d Cir.1991). Taken together, the general impression conveyed to the public by these designations differs somewhat. This factor weighs slightly in favor of defendant.

### 3. Proximity of Products

"Under this *Polaroid* factor, [the court] considers whether the two products compete with each other." *The Sports Authority*, 89 F.3d at 963. In the instant case, the two products clearly compete with each other. Both products are sake that are sold to restaurants, supermarkets and specialty stores. This factor weighs in favor of plaintiff.

### 4. Bridging the Gap

"This factor looks to either the likelihood that [plaintiff] will enter [defendant's] business or the average customer's perception of the likelihood that the plaintiff would enter the defendant's market." *The Sports Authority*, 89 F.3d at 963. This factor is inapplicable to the instant case because, as mentioned above, the products are identical and therefore there is no gap to bridge.

### 5. Actual Confusion

"The Lanham Act seeks to prevent consumer confusion that enables a seller to pass 'off his goods as the goods of another.'" *W.W.W. Pharmaceutical Co.*, 984 F.2d at 574 (citation omitted). While no evidence of actual confusion is required to prove the likelihood of confusion, the absence of proof of actual confusion may support the inference that there is also no likelihood of confusion. *Inc. Publishing Corp. v. Manhattan Magazine, Inc.*, 616 F.Supp. 370, 386 (S.D.N.Y. 1985), *aff'd*, 788 F.2d 3 (2d Cir.1986).

Here, plaintiff has submitted some evidence of some actual confusion. OCL alleges that upon learning of the existence of Mutsu Otokoyama sake in New Jersey and New York, the general manager of OCL's authorized dealer contacted OCL to ask if defendant's sake was a product made or distributed by OCL. Additionally, OCL's distributor in New York and New Jersey has received inquiries from retailers as to wheth-

er the Mutsu Otokoyama sake is associated with or authorized by OCL and whether there was any difference between the two products. Declaration of Tadashi Itabashi ¶¶ 13, 17. In addition, a representative of OCL's distributor, Mr. Tanaka, testified that he received three calls from consumers who asked if OCL had changed its sake. Tr. at 26, 42. This factor thus weighs in favor of plaintiff. *See Multi–Local Media Corp. v. 800 Yellow Book Inc.*, 813 F.Supp. 199, 204–05 (E.D.N.Y.1993) (actual confusion existed where plaintiff received several phone calls asking whether defendant was affiliated with plaintiff).

### 6. Defendant's Good Faith in Adopting the Mark

"This factor 'looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product."' *Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir.1991) (quoting *Edison Brothers Stores, Inc. v. Cosmair, Inc.*, 651 F.Supp. 1547, 1560 (S.D.N.Y.1987)). A court may find that the defendant acted in good faith where it has "selected a mark which reflects the product's characteristics, has requested a trademark search or has relied on advice of counsel." *W.W.W. Pharmaceutical*, 984 F.2d 567, 575 (2d Cir.1993) (citation omitted). Furthermore, bad faith is not necessarily found where defendant was aware of the senior user's mark. *Id.*

Plaintiff states in conclusory fashion that defendant acted in bad faith and is using plaintiff's trademark to "palm off" its products as those of OCL in order to "usurp" OCL's good will. Defendant, on the other hand, claims that it has not acted in bad faith because it is marketing its sake in the U.S. the same way it has in Japan for 150 years. Furthermore, defendant points out that it has not acted in bad faith because it believes that plaintiff does not have a valid trademark registration. There is little evidence here to suggest bad faith on defendant's part and therefore this factor weighs in defendant's favor.

### 7. Quality of the Products

"This factor is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Arrow Fastener Co. v. Stanley Works,* 59 F.3d 384, 398 (2d Cir.1995). Plaintiff has offered evidence that its sake is very high quality and that it is a member of the Japan Prestige Sake Association. However, defendant's sake is also of high quality. In the last ten years Mutsu Otokoyama has won the gold medal prize given by the Japanese government's Institute of Brewery Research three times, the most recent won in 1990. Furthermore, Mutsu Otokoyama has won the gold prize seven times, including four of the last five years. Declaration of Mitsumasa Takeda ¶ 14. Because defendant's product is not of inferior quality, this factor weighs in favor of the defendant.

### 8. Sophistication of Consumers

In considering the likelihood of confusion, the court should finally assess the level of sophistication of the relevant purchasers. *W.W.W. Pharmaceutical,* 984 F.2d at 575. The court must consider "[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Id.* (citation omitted)(alteration in original).

Sake is sold at restaurants and in grocery stores. It is a relatively inexpensive item, and even defendant concedes that the sake market is only *beginning* to become more sophisticated in the United States. Therefore, because there is evidence that consumers of sake are not very sophisticated, this factor weighs in plaintiff's favor.

### C. Balancing of Hardships

Both parties will lose money if the injunction is either granted or denied. However, plaintiff stands to lose its reputation that it has taken thirteen years to establish. Defendant, on the other hand, is new to the United States market, and does not have an established reputation. Therefore, the hardships tip in favor of plaintiff.

### D. Balancing the Factors

In summary, because plaintiff has a relatively strong mark, because the products are identical, because there is some evidence of actual confusion, because the consumers are not sophisticated, and because the balance of hardships tips decidedly in plaintiff's favor, plaintiff has demonstrated irreparable harm and sufficiently serious questions going to the merits to warrant granting a preliminary injunction.

### IV. Conclusion

For the reasons set forth above, plaintiff's motion for a preliminary injunction is GRANTED as follows. Defendant Wine of Japan Import, Inc., its officers, agents, servants, employees and any other persons in active concern or participation with it are hereby enjoined and restrained during the pendency of this litigation or until further order of this Court from:

(1) Using any of OCL's Otokoyama Trademarks or any other mark which is confusingly similar to the Otokoyama Trademarks in connection with the advertisement, distribution, manufacture, sale, or offering for sale of sake products, and from acting in any manner likely to cause others to believe that defendant's products are connected with plaintiff or plaintiffs Otokoyama sake; and

(2) Passing off, inducing, or enabling others to sell or pass off any products and other related products which are not genuine and authorized by OCL as and for genuine and/or authorized OCL products; and

(3) Committing any other acts calculated to cause purchasers to believe that defendant's products are genuine OCL products, or products authorized by OCL unless they are such. The parties are directed to contact my Courtroom Deputy to schedule a Pre–Trial conference in this matter

**SO ORDERED.**